**2026 UT App 15**

## THE UTAH COURT OF APPEALS

JEDDIE AL-IMARI, KATHLEEN AL-IMARI, AND JENNIFER AL-IMARI,
Appellants,
*v.*
UTAH DEPARTMENT OF TRANSPORTATION
AND STAKER PARSON COMPANIES,
Appellees.

Opinion
No. 20231018-CA
Filed February 5, 2026

First District Court, Logan Department
The Honorable Angela Fonnesbeck
No. 210100162

Brad H. Bearnson and Wayman M. Stodart,
Attorneys for Appellants

George W. Burbidge II and W. Kevin Tanner,
Attorneys for Appellee Staker Parson Companies

Joseph E. Minnock and Anna Nelson, Attorneys for
Appellee Utah Department of Transportation

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE GREGORY K. ORME concurred. JUDGE DAVID N. MORTENSEN
dissented, with opinion.

HARRIS, Judge:

¶1      Jeddie Al-Imari, Kathleen Al-Imari, and Jennifer Al-Imari
(collectively, the Al-Imaris) sued the Utah Department of
Transportation (UDOT) and Staker Parson Companies (Staker),
asserting that UDOT and Staker negligently caused a car accident
in which some of them had been involved. The district court
dismissed the Al-Imaris' suit on summary judgment, however,
because the court deemed the Al-Imaris' expert witness

designation deficient and, after barring the expert from testifying, concluded that the Al-Imaris could not prove their case.

¶2    The Al-Imaris now appeal, challenging both the district court's decision to exclude their expert witness as well as the court's order dismissing their case on summary judgment. For the reasons discussed, we agree with the Al-Imaris that—although their designation was indeed initially deficient—the court should not have excluded their expert witness under the circumstances presented here, and on that basis we reverse both the order striking the witness and the order granting summary judgment.

## BACKGROUND[1]

¶3    Jeddie and Kathleen Al-Imari, along with two of their young grandchildren, were driving southbound on Highway 89 in Logan Canyon on a rainy day when their car "encountered oil or [some] other slick substance on the road," which they claim "caused [their] vehicle to lose traction, spin 180 degrees, travel off the road, and flip over into the adjacent Logan River." Bystanders had to cut the occupants' seat belts to extract them from the vehicle, and one of them required resuscitative CPR after being pulled from the water. All four occupants were transported to a nearby hospital for treatment and observation.

¶4    Nearly two years later, the Al-Imaris filed suit against UDOT and Staker for negligence. They alleged that UDOT hired Staker to install a new asphalt surface on Highway 89 and that Staker created an unsafe condition on the road at the site where the car crash occurred. Specifically, the Al-Imaris alleged that the road resurfacing project resulted in oil or some other slick substance being left on the road and that UDOT and Staker failed

---

1. In reviewing a grant of summary judgment, "we recite the facts in the light most favorable to the non-moving party." *Burton v. Chen*, 2023 UT 14, ¶ 5 n.2, 532 P.3d 1005 (cleaned up).

to maintain the construction site in a safe manner. The Al-Imaris further alleged that UDOT and Staker failed to provide proper signage at the site warning of the danger of construction hazards, including the risk posed by oil or other slick substances.

¶5    Soon after the close of the fact discovery period, the Al-Imaris timely filed their expert witness disclosures, as required by rule. *See* Utah R. Civ. P. 26(a)(4)(A), (C). In those disclosures, the Al-Imaris designated twelve non-retained experts (all of whom appear to be medical or mental health professionals) but only one retained expert (Expert)—an individual they described as a "licensed professional engineer with expertise in vehicle collision reconstruction, commercial vehicle crash investigation and analysis, roadway design, . . . traffic controls, . . . and automotive safety and design issues." As required, the Al-Imaris produced a copy of Expert's curriculum vitae and a list of all his publications from the preceding ten years.

¶6    In those same disclosures, the Al-Imaris included a paragraph purporting to be a "Brief Summary of Opinions" that Expert would offer. That paragraph, in full, states as follows:

> [Expert] is expected to testify regarding the conditions present at the incident site, the obligations of construction contractors in sealing roadways, signage requirements, Utah regulations relating to roadway surfacing, and safety conditions necessitated by weather. Expert is also expected to testify regarding the factors contributing to the underlying accident.

Immediately following this summary, the Al-Imaris provided a list of categories of data that Expert would rely upon in reaching his opinions, including the "US DOT Field Guide," "[c]onstruction site maps and photos," and "[l]aws, regulations, rules, and industry standards applicable in the subject case."

¶7    Thirteen days after the Al-Imaris served their expert witness disclosures, Staker filed a motion—joined by UDOT—asking the court to strike the designation of Expert, arguing that the Al-Imaris had failed to disclose an adequate summary of Expert's opinions. Staker argued that "the designation states no opinions that [Expert] will offer, but only a statement listing the topics about which he will testify." Staker specifically argued that, in the designation, there was no indication whether Expert would offer any "opinion on whether or not there was oil on the road, whether or not signs were required, or if the alleged substance caused the subject accident." And Staker argued that the claimed deficiencies in the designation were not harmless, asserting that it could not "determine if a deposition [was] needed or not, as no opinions [were] formed or expressed in the designation."

¶8    Nevertheless, the very next day both defendants made the election to request an expert report (rather than a deposition) from Expert, although in those election documents each defendant specified that it made its election "out of abundance of caution" and "only in the alternative as necessary," without intending to "waive" its "rights" regarding the pending motion to strike the Al-Imaris' designation of Expert.

¶9    The Al-Imaris opposed the motion to strike, arguing that they were "not required to list each specific opinion formulated by [Expert] but rather the summary of what those opinions consist of." They reiterated that Expert was "expected to opine regarding the conditions present at the incident site, the obligations of construction contractors in sealing roadways, signage requirements, Utah regulations relating to roadway surfacing, and safety conditions necessitated by the weather," and they argued that this description satisfied the requirements of the governing rule. And a few weeks later, while the motion to strike was still pending, the Al-Imaris served a copy of Expert's full written report on UDOT and Staker.

¶10 After full briefing, the court held oral argument on the motion to strike. There, Staker argued that it had been unable to make an informed election between a deposition or a report because the summary of Expert's opinions was inadequate. Staker argued that the summary was "simply a list of topics" and "not an opinion," and that—to meet the rule's requirements—the summary would have needed to state, for example, that Expert would "opine . . . [that] an oily condition caused" the accident, "in conjunction with the rain," or words to that effect so "that [the defendants] would know" what they "were going to be facing." Staker explained why it elected to receive a report (rather than take a deposition) by asserting that, without a more fulsome summary of Expert's opinions, "there was no way to prepare for a deposition, so [it] chose . . . the lesser of two evils, and opted for the report."

¶11 In response, the Al-Imaris argued that the summary of Expert's opinions was not deficient and that even if it was, the "appropriate remedy" was not to prevent Expert from testifying but, instead, for the court to require them to supplement the disclosure, which they had already offered to do. And they added that, if after reviewing a supplemental summary of Expert's opinions (as had presumably been included in the already-served full report), UDOT and Staker wished to take Expert's deposition (thus affording them both a report and a deposition), the Al-Imaris would not oppose that effort.

¶12 At the conclusion of the hearing, the court made an oral ruling—later memorialized in a written order—granting the motion to strike. The court explained that the Al-Imaris' disclosure "provided a list of areas on which an opinion might be given," but it "did not provide the meaningful type of summary" that is required by rule. In its written order, the court stated that there were "no opinions expressed in the designation nor facts upon which an opinion would be based" and that "such a designation was improper." In addition, the court found that the

"result in this case [was] not harmless and no showing of good cause ha[d] been made," and that UDOT and Staker "[could not] act on the designation provided." The court concluded its order by decreeing that Expert "shall not testify at trial."

¶13   A few weeks after entry of the court's written order precluding Expert from testifying at trial, Staker filed a motion for summary judgment—joined by UDOT—arguing that without Expert's testimony, the Al-Imaris could not support their claims. Staker argued that "due to the nature of the accident, the actual cause of the accident requires expert testimony as the allegations are not within the customary knowledge of the typical juror." In turn, Staker argued that because Expert's designation had been struck, the Al-Imaris could not prove that Staker or UDOT had breached any duty of care involving the road resurfacing or signage. The Al-Imaris opposed the motion, arguing that they needed no expert to establish the standard of care in their case because the Restatement (Second) of Torts provided the applicable standard of care for hazardous conditions on land.

¶14   After full briefing and oral argument, the district court granted the motion for summary judgment. The court found that "this is the type of case which requires an expert opinion or opinions as to the proper standard of care." It explained that "the understanding of [the relevant] duties is beyond the grasp of a typical jury and requires [the] specialized knowledge of an expert." The court then rejected the Al-Imaris' reliance on the Restatement for a standard of care, because, in the court's view, the Al-Imaris "produced no evidence supporting such a duty in this matter." The court similarly found that the Al-Imaris' claim failed as to causation because there was "no evidence that UDOT or Staker created the dangerous condition" on the road or that "it was a dangerous condition that caused . . . [Jeddie] Al-Imari to lose control of his vehicle."

¶15    Based on these rulings, the district court later entered judgment in favor of UDOT and Staker on the Al-Imaris' claims.

## ISSUES AND STANDARDS OF REVIEW

¶16    The Al-Imaris now appeal, and they ask us to consider two issues. First, they challenge the district court's order striking their designation of Expert and precluding Expert from testifying at trial. We review for correctness the district court's conclusion that the designation was inadequate under applicable rules, but we review for abuse of discretion whether any deficiencies in the designation were harmless or justified by good cause. *See Butler v. Mediaport Ent. Inc.*, 2022 UT App 37, ¶ 17, 508 P.3d 619.

¶17    Second, the Al-Imaris challenge the district court's order granting summary judgment in favor of UDOT and Staker. We review a "grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Turley v. Childs*, 2022 UT App 85, ¶ 16, 515 P.3d 942 (cleaned up).

## ANALYSIS

¶18    We first address the Al-Imaris' challenge to the district court's order striking their designation of Expert and precluding Expert from testifying at trial. For the reasons discussed, we agree with the Al-Imaris that the district court's order is infirm and that the court exceeded its discretion by imposing the severe sanction of exclusion under these circumstances. And with Expert's testimony back in the mix, summary judgment in favor of UDOT and Staker is inappropriate. We therefore reverse both challenged orders and remand the case for further proceedings.

I. The Order Precluding Expert from Testifying

¶19   Under applicable rules, parties who wish to present testimony at trial from retained expert witnesses must make certain disclosures to their litigation opponents. *See* Utah R. Civ. P. 26(a)(4)(A). In particular, a "party who bears the burden of proof on the issue for which expert testimony is offered must" make disclosures "within 14 days after the close of fact discovery." *Id.* R. 26(a)(4)(C)(i). Such disclosures must include "(i) the expert's name and qualifications, . . . (ii) a brief summary of the opinions to which the witness is expected to testify, (iii) the facts, data, and other information specific to the case that will be relied upon by the witness in forming those opinions, and (iv) the compensation to be paid for the witness's study and testimony." *Id.* R. 26(a)(4)(A).

¶20   Disclosure requirements like this one are aimed at allowing one's litigation opponents to "make better informed choices about the discovery they want to undertake or, just as important, what discovery they want to forgo." *RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 25, 392 P.3d 956 (addressing a non-retained expert disclosure); *see also* Utah R. Civ. P. 26 advisory committee's note to 2011 amendment (discussing the requirements of rule 26(a)(1) and stating that such rules are meant to facilitate the transmission of "basic information" about a witness's expected testimony at trial "so that the other side may determine the witness's relative importance in the case, whether the witness should be interviewed or deposed, and whether additional documents or information concerning the witness should be sought").

¶21   The retained expert disclosure requirement at issue here is chiefly intended to ensure transmission of information sufficient to inform one specific decision: whether to elect a report or a deposition from the expert witness in question. *See* Utah R. Civ. P. 26(a)(4)(C)(i). Indeed, following this disclosure, the receiving party ("the party opposing the expert") is given just fourteen days

to "serve notice electing either a deposition of the expert . . . or a written report." *Id.*

¶22 This choice has not always been part of the rule. Before the 2011 amendments, parties were entitled to receive a written report from every retained expert designated by the other side, and in addition were still allowed, at their option, to take that expert's deposition*. See id.* R. 26(a)(3)(B), (a)(6) (2010). But in an effort to reduce the costs of litigation, the 2011 amendments ushered in a new framework for retained expert designations: parties defending against such an expert are now required to choose a report or a deposition, but they ordinarily can't have both. *See id.* R. 26(a)(4)(B) (2025) ("Further discovery may be obtained from an expert witness *either* by deposition or by written report." (emphasis added)). And to facilitate an intelligent exercise of this choice, designating parties are required to provide the other side with certain information about each designated retained expert, including a "brief summary" of the witness's expected opinions. *See id.* R. 26(a)(4)(A). The drafters of the rule—in discussing the rule's initial disclosure requirement, which we have stated also "presumably" concerns "expert witnesses," *see RJW Media*, 2017 UT App 34, ¶ 23—made clear, however, that a "summary" of a witness's "expected testimony should be just that—a summary," and they emphasized that "[t]he rule does not require prefiled testimony or detailed descriptions of everything a witness might say at trial." Utah R. Civ. P. 26 advisory committee's note to 2011 amendment. Thus, to fulfill its intended purpose, a retained expert witness disclosure needs to contain, at a minimum, information sufficient to allow the other side to make an informed decision about whether to elect a report or a deposition.

¶23 Against this backdrop, we first address whether the Al-Imaris' designation of Expert met rule 26's "brief summary of opinions" requirement, and we conclude that the designation was not entirely in compliance with the rule's requirements. Next, we address the extent to which the designation's deficiencies caused

harm to UDOT and Staker and, more particularly, whether the district court exceeded its discretion in imposing the sanction of exclusion under the circumstances presented.

A

¶24 As already noted, the applicable rule required the Al-Imaris to provide "a brief summary of the opinions to which [Expert was] expected to testify." *See id.* R. 26(a)(4)(A). The district court determined that the Al-Imaris' designation did not meet this requirement, concluding that it "contain[ed] only a list of topics on which opinions will be offered" and that it contained "no opinions . . . nor facts upon which an opinion would be based." We agree that the Al-Imaris' designation did not strictly comply with this part of the rule.

¶25 At the outset of our analysis, it bears noting that the Al-Imaris hardly ignored the expert-designation deadline. Indeed, their designation of Expert as their sole retained expert witness was timely and was compliant with the rule in *nearly* every respect. It contained Expert's "name and qualifications" and a list of his "publications authored within the preceding 10 years," as well as a list of the cases in which he had "testified as an expert at trial or by deposition within the preceding four years." *Id.* It included a copy of his curriculum vitae. It included a list of a dozen categories of data upon which his opinions would be based. And it included an attachment setting forth the compensation he would receive for his services in the case. UDOT and Staker do not meaningfully or separately criticize these portions of the designation.[2]

---

2. UDOT and Staker do assert, almost in passing, that Expert's disclosure was also deficient because it "failed to adequately disclose the facts, data, and other information specific to the case that would be relied upon by [Expert]." *See* Utah R. Civ. P.

(continued…)

¶26 They do, however, take issue with the adequacy of the "brief summary of the opinions" to which Expert was expected to testify. *Id.* That summary was indeed brief—composed of just one paragraph—and it stated that Expert was "expected to testify" about several things, including the following:

- "the conditions present at the incident site";

- "the obligations of construction contractors in sealing roadways";

- "signage requirements";

- "Utah regulations relating to roadway surfacing";

- "safety conditions necessitated by weather"; and

- "the factors contributing to the underlying accident."

UDOT and Staker assert that this "summary of opinions" doesn't actually contain any opinions; they characterize it as simply a list of topics that Expert will discuss.

¶27 In a case construing similar language regarding non-retained expert disclosures, we held that a disclosure was deficient because it provided only the witness's "name, title, and

26(a)(4)(A). But UDOT and Staker do not develop this argument; to the contrary, they implicitly concede that Expert's "list" of categories of materials upon which his opinions would be based "may be appropriate." Indeed, their argument quickly devolved back into the same argument lodged with regard to the summary of opinions: that Expert "has not formulated any opinions" and therefore UDOT and Staker did not know what relevance the list of relied-upon materials might have. We therefore consider UDOT and Staker's complaints regarding Expert's list of materials to be coextensive with their complaints about Expert's summary of opinions.

a generic description of the topics about which" he, along with nine other witnesses included in the same disclosure, would testify. *See RJW Media*, 2017 UT App 34, ¶ 7. We pointed out that this disclosure included "no facts or opinions . . . whatsoever." *Id.* ¶ 26. And we criticized the disclosure for including only "a list of general topics about which [the non-retained expert], along with nine other witnesses, might testify." *Id.* To be sure, the language we were construing in *RJW Media* concerned non-retained experts and is slightly different from the language we are construing here, but no party asserts that—as applied here—the differences in the rule's text should matter. *Compare* Utah R. Civ. P. 26(a)(4)(E) (stating that non-retained expert disclosures must contain "a written summary of the facts and opinions to which the witness is expected to testify"), *with id.* R. 26(a)(4)(A) (stating that retained expert disclosures must contain "a brief summary of the opinions to which the witness is expected to testify"). And we agree that any rule that requires a "summary" of "opinions to which [a] witness is expected to testify" requires more than just a list of topics; such a rule necessarily requires at least a brief summary of the witness's actual opinions regarding those topics.

¶28    In this regard, the Al-Imaris' designation of Expert was deficient. While it provided a lot of information about Expert, as well as a list of topics about which Expert would offer opinions, the disclosure did not take the extra required step and actually offer UDOT and Staker even a "brief summary" of what those opinions would be. On this basis, we agree with the district court that Expert's disclosure was out of compliance.

¶29    But we emphasize that—under the specific circumstances presented here—the Al-Imaris wouldn't have needed to do much to bring this disclosure into compliance. An expert witness designation is, by design, a far cry from an expert report. The rule requires only that the designation include a "brief summary" of the expert's anticipated opinions, and it therefore need not include "prefiled testimony or detailed descriptions of everything

a witness might say at trial." *See id.* R. 26 advisory committee's note to 2011 amendment. And the designation need not even include all that much detail about the expert's opinions.

¶30   In this case, UDOT and Staker knew that Expert was going to be the Al-Imaris' sole negligence and accident-causation expert; after all, each of the other experts disclosed in the Al-Imaris' designation were non-retained medical providers who would perhaps discuss damages but who would be in no position to discuss the accident itself. And it stands to reason that, as the Al-Imaris' sole expert on these key issues, Expert would be offering opinions in favor of the Al-Imaris (and against UDOT and Staker) on the topics listed in the designation; without opinions on these points in the Al-Imaris' favor, their case would likely be subject to dismissal. For instance, the disclosure indicated that Expert would offer opinions about "the obligations of construction contractors in sealing roadways" and about "signage requirements." Under the circumstances, after reviewing this designation, UDOT and Staker certainly would have understood that Expert—as opposed to some other witness—intended to offer an opinion that UDOT or Staker breached those obligations by not properly sealing the roadway on the day in question and by not putting up signs as necessary to warn motorists. And had the disclosure included just a few additional words along those lines, the disclosure would have met the rule's requirement—at least with regard to those topics—that it contain a "brief summary" of Expert's opinions.[3] Stated another way, to be compliant, the

---

3. We acknowledge that the situation is somewhat different regarding causation of the accident. On that topic, the designation stated only that Expert would "testify regarding the factors contributing to the underlying accident." This sentence is dangerously similar to a sentence that the drafters of rule 26 indicated would not be sufficient in this context: "The witness will testify on causation." *See id.* R. 26 advisory committee's note to

(continued…)

designation did not need to include much detail about the bases underlying the opinions; all of that is designed to be more fully explored later, either in a full-blown report or in a deposition.[4]

¶31   Nevertheless, and despite the fact that the designation contained quite a bit of information about Expert that could have been used to make the report-or-deposition choice, the Al-Imaris' designation was in violation of the applicable rule. That rule required the designation to include a "brief summary" of Expert's anticipated opinions, and it did not. For this reason, the district court committed no error in concluding that the Al-Imaris' designation of Expert did not comply with the rule.

¶32   But we consider the violation here to have been on the less-egregious end of the spectrum, given that (a) this case does not involve a complete failure to disclose, but instead involves an infirmity contained within a timely disclosure that was otherwise completely in compliance; (b) much of the missing information (e.g., that Expert would offer negligence and causation opinions in favor of the Al-Imaris and against UDOT and Staker) could be

---

2011 amendment. On causation, the Al-Imaris' designation of Expert was out of compliance to a greater degree than it was with regard to negligence issues. But even here, it wouldn't have taken all that much to bring the designation into compliance; a sentence or two stating, for instance, that Expert would opine that UDOT and Staker's actions in breaching the standard of care proximately caused the Al-Imaris' accident would likely have sufficed.

4. UDOT and Staker argue, for instance, that the designation was deficient because it did not include "any opinion from [Expert] regarding whether or not there was oil on the road or the identity of the slick substance [or] whether or not signs were required and if so, what signs were required." We disagree with the assertion that, to be compliant with rule 26(a)(4)(A), the "brief summary" of Expert's opinions had to include that level of detail.

easily gleaned from context; and (c) the Al-Imaris would not have needed to do all that much to bring the designation into compliance with the rule's requirements.

B

¶33　With these conclusions in mind, we proceed to address the next issues: whether and to what extent the deficiencies in the Al-Imaris' expert witness disclosure were harmful to UDOT and Staker, and whether the district court exceeded its discretion by imposing the ultimate sanction of exclusion and dismissal.

¶34　We begin by reciting a fundamental principle, one that in our view bears repeating: not every discovery or disclosure violation deserves a sanction. The rules dictate that a party who "fails to disclose or to supplement timely a disclosure or response to discovery" is subject to sanction, and the rule even specifies what that sanction should ordinarily be: the party will be forbidden from "us[ing] the undisclosed witness, document, or material at any hearing or trial." Utah R. Civ. P. 26(d)(4). But if the "failure is harmless," or if the violating party "shows good cause for the failure," then no sanction is warranted. *Id.* In this case, the Al-Imaris make no argument that their noncompliance should be excused for good cause. But they do assert that their noncompliance was, in context, harmless and did not warrant the stiff sanction imposed by the district court.

¶35　As already noted, we review a district court's harmlessness determination for abuse of discretion. *See Butler v. Mediaport Ent. Inc.*, 2022 UT App 37, ¶ 17, 508 P.3d 619. We have recognized that some measure of deference to a district court's decision is in this context warranted because "assessment of harm" in the context of a failure to disclose "is a nuanced matter." *Id.* ¶ 48. In many cases, a litigant will suffer clear and demonstrable harm from an opponent's failure to comply with disclosure rules. But in other cases, a litigant might be overstating its claims of harm, all in an effort to win a non-merits dismissal of an opponent's lawsuit. And

we have noted that a district court is usually better positioned than we are to determine whether a litigant "has really been harmed" by a late or inadequate disclosure or is, instead, "just feigning harm for the purposes of trying to get" the "claims dismissed on non-merits grounds prior to trial." *Id.* For these reasons, district courts enjoy broad discretion in this context, but that discretion is not boundless. *See Welsh v. Hospital Corp. of Utah*, 2010 UT App 171, ¶ 10, 235 P.3d 791 ("[A] trial court's discretion to exclude expert witness testimony is not absolute.").

¶36     Indeed, in one case, we concluded that a district court had exceeded its discretion in making a harmlessness determination in this context. *See Johansen v. Johansen*, 2021 UT App 130, ¶ 19, 504 P.3d 152. In that case, the district court deemed a disclosure violation—there, a complete failure to serve any initial disclosures at all—to be harmless. *Id.* ¶¶ 3, 14. On appeal, we determined that this ruling was too lenient and represented an abuse of the relatively wide discretion afforded to district courts in making harmlessness determinations. *Id.* ¶ 19. Thus, *Johansen* stands for the proposition that a district court's discretion in this regard is not boundless and that a court can exceed its discretion in making too lenient a decision regarding harmlessness.

¶37     But abuse of discretion is a street on which traffic necessarily runs both ways: a district court can also exceed its discretion in the opposite direction, by making a ruling that exceeds the bounds of discretion by being unduly harsh. We reject the notion that abuse of discretion in the rule 26 context can run in only one direction, and in this vein we are reminded of our supreme court's admonition to district courts about how they should wield their discretion in the context of discovery sanctions:

> It is true that where the authority to perform a proposed action rests within the discretion of the court we must allow considerable latitude in which [the court] may exercise [its] judgment. But this does

not mean that the court has unrestrained power to act in an arbitrary manner. . . . The meaning of the term "discretion" itself imports that the action should be taken within reason and good conscience in the interest of protecting the rights of both parties and serving the ends of justice. It has always been the policy of our law to resolve doubts in favor of permitting parties to have their day in court on the merits of a controversy.

*Carman v. Slavens*, 546 P.2d 601, 603 (Utah 1976) (cleaned up); *see also Davis v. Riley*, 437 P.2d 453, 455 (Utah 1968) ("The word 'discretion' itself imports that the action should be taken with reason and in good conscience, and with an understanding of and consideration for the rights of the parties, for the purpose of serving the always desired objective of doing justice between them."); *cf. Coroles v. State*, 2015 UT 48, ¶¶ 25–29, 349 P.3d 739 (instructing a district court, on remand, that an order excluding a witness would be too harsh under the circumstances and "would be an abuse of discretion"). Indeed, the drafters of the 2011 amendments to rule 26, while instructing that "the usual and expected result" of disclosure violations "should be exclusion of the evidence," nevertheless emphasized that, despite the existence of a disclosure violation, "a trial court retains discretion to determine how properly to address [disclosure violations] in a given case." *See* Utah R. Civ. P. 26 advisory committee's note to 2011 amendment. In our view, this case presents a rare example of an instance in which a district court exceeded the bounds of its discretion by issuing a ruling that was too harsh.

¶38 In this case, the only harm identified by UDOT and Staker is their contention that they were unable to make a meaningful election between report and deposition after reviewing the Al-Imaris' designation of Expert. They contend that the designation did not provide enough information to allow them to adequately prepare for a deposition, and so they (provisionally) chose "the

lesser of two evils, and opted for the report." For purposes of our discussion, we will assume the accuracy of this statement, and we will presume that—as of the date they filed their motion to strike and made their provisional election of "report"—they had sustained at least some harm in the sense that they were not able to make a fully informed election between report and deposition.

¶39 But even given these assumptions, the district court still exceeded its discretion, under the circumstances presented here, by imposing a disproportionate sanction—exclusion and dismissal—that was not warranted by the severity of the violation and the level of harm sustained.

¶40 At times, we have referred to the sanction prescribed by rule 26(d)(4) as "mandatory," and we have contrasted this with "discretionary" sanctions permitted under other rules. *See, e.g.*, *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶ 19, 370 P.3d 963. Because the rule utilizes the phrase "may not use," there is a mandatory component to rule 26(d)(4) sanctions: unless the party in violation of its disclosure obligations can demonstrate that it had good cause for its violation or that the violation was harmless, that party will ordinarily not be allowed to use the undisclosed witness or document at trial. *See* Utah R. Civ. P. 26(d)(4). But we think it important to clarify that the "mandatory" nature of the sanction does not require a court to automatically order full exclusion of a witness or document in every single case in which a nondisclosing party sustains some modicum of harm at the moment the disclosure violation occurred.[5]

---

5. Indeed, as noted, the drafters of the 2011 amendments appeared to believe that this sanction was something short of automatic, referring to it merely as a "usual and expected" sanction while observing, in the same sentence, that "a trial court retains discretion to determine how properly to address" a disclosure

(continued…)

¶41    In some cases, a violating party will be able to demonstrate that no harm has resulted from the disclosure violation; in such cases, no sanction is warranted. *See id.* But even where harm is found to be present, cases exist in which any harm is minimal and can easily be ameliorated by imposition of measures short of exclusion of the document or witness. In such cases, it lies within a district court's discretion to impose measures short of exclusion and thereby erase any harm that might have been caused by the disclosure violation. *See Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 22, 470 P.3d 479 (affirming a sanction of exclusion, but noting that "another judge might have determined that the defendants' harm could have been remedied in a different way, perhaps through an assessment of attorney fees and costs against [the offending party] imposed in connection with an extension of the deadlines"); *De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 38, 545 P.3d 285 (Harris, J., concurring) (noting that the district court could have chosen an alternative non-exclusionary remedy that "both (a) alleviated all harm" caused by the violation "as well as (b) allowed adjudication of [the plaintiff's] new claim on its merits"). Where measures short of exclusion are imposed that entirely ameliorate any harm caused by the disclosure violation, the violation becomes harmless, and in such cases the rule allows for no further sanction (e.g., exclusion) to be imposed. *See* Utah R. Civ. P. 26(d)(4) (stating that the sanction of exclusion is to be

---

violation "in a given case." *See* Utah R. Civ. P. 26 advisory committee's note to 2011 amendment; *see also id.* R. 1 (stating that the rules are to "be liberally construed and applied to achieve the *just*, speedy, and inexpensive determination of every action" (emphasis added)); *id.* R. 1 advisory committee's note to 2011 amendment ("A primary purpose of the 2011 amendments is to give effect to the long-standing but often overlooked directive in Rule 1 that the Rules of Civil Procedure should be construed and applied to achieve 'the just, speedy and inexpensive determination of every action.'").

imposed "*unless* the failure is harmless or the party shows good cause for the failure" (emphasis added)).

¶42    And it is important here to emphasize that harmlessness, in this context, is to be assessed as of the time the court makes its decision, and *not* as of the time the disclosure violation occurred. From a textual standpoint, the rule uses present tense and asks a district court to determine whether "the failure *is* harmless." *See id.* (emphasis added); *see also Scott v. Scott*, 2017 UT 66, ¶ 24, 423 P.3d 1275 (recognizing that "is" is "a present-tense verb" (cleaned up)). And in similar contexts, we have held that the verb "is," when used in statutes calling for a judicial determination, requires a court to conduct a "present-tense analysis" as of the date of the determination in question. *See, e.g., In re Z.C.W.*, 2021 UT App 98, ¶¶ 13–15, 500 P.3d 94 (construing a statute requiring courts to "determin[e] whether termination [of parental rights] *is* in the best interest of the child" (cleaned up)); *accord In re A.H.*, 2024 UT 26, ¶ 55, 554 P.3d 969.

¶43    From a practical standpoint, this makes perfect sense. When a court assesses the harmfulness of a disclosure violation, it must necessarily assess the harm caused by that failure, which will almost always include events subsequent to the failure. For example, in *De La Cruz*, we explained that a party was harmed by an untimely damages disclosure because "[f]or nearly the entirety of the fact discovery period," the innocent party understood the damages to be "around $11,000 and made decisions about how much discovery to conduct and what questions to ask based on that information." 2024 UT App 18, ¶ 20. The "belated damages disclosures," however, "increased [the] claimed damages sixfold" and prevented the innocent party from having "an opportunity during the fact discovery period to conduct discovery" on the new damages claims. *Id.* Obviously, the disclosing party's failure to adequately disclose the damages preceded the harmful consequences crucial to our analysis—in other words, the inadequate disclosure at the outset inhibited the innocent party's

ability to tailor their fact discovery proportionally to the case's value as discovery unfolded. *See id.*; s*ee also Erickson v. Erickson*, 2022 UT App 27, ¶ 28, 507 P.3d 824 (explaining that the late expert disclosure on the eve of trial was harmful because it "deprived [the innocent party] of a reasonable opportunity to prepare to rebut the newly disclosed expert's testimony" at trial).

¶44 By the same token, a disclosure violation may cause some harm in the moment, on the day it was made, but if that harm has been completely ameliorated—on its own, or through actions of the parties—in the intervening time between the disclosure and the eventual court hearing on the matter, then no harm exists at the time the court is asked to make its determination as to harmlessness. *See Butler*, 2022 UT App 37, ¶ 34 ("Where additional illuminating information was received by an opposing party relatively early during the discovery period, within enough time to allow that party to use that information while taking depositions and propounding other discovery requests, then any inadequacies in a party's damages disclosures may turn out to be harmless." (cleaned up)). For example, in *Coroles*, our supreme court assessed the harmlessness of a failure to disclose expert witnesses, and in doing so, it considered developments that occurred after the failure to disclose. 2015 UT 48, ¶ 28. There, the plaintiff had "designated her initial expert witnesses by the deadline established in the scheduling order," but two months later, the defendants moved to exclude those experts. *Id.* ¶¶ 6, 28. In response, the plaintiff "promptly designated replacement experts two weeks *after* the defendants moved to exclude her initial experts." *Id.* ¶ 28 (emphasis added). In considering whether to allow the replacement experts to testify, the court noted that all of this had occurred before a trial date had even been set. *Id.* And the court held that "the only prejudice identified by the district court for allowing the replacement experts to testify would be the need for a new scheduling order and a potential delay in the eventual trial date." *Id.* That kind of harm, the supreme court held,

did not justify forbidding the plaintiff from calling expert witnesses. *Id.* ¶ 29.

¶45    Again, this is intuitive: a harmlessness determination must be made as of the time the assessment is undertaken—in many cases, this will occur on the fly during trial, when (for instance) a party asks to use a theretofore nondisclosed document and the other side objects—and it must take into account not only post-disclosure-violation harm but also post-disclosure-violation mitigation. It would be nonsensical for us to require courts to freeze the harm analysis as of the time the disclosure violation occurred and ignore later developments in the case that either worsened or mitigated any resulting harm. The rules are simply not that wooden; indeed, as noted, the language of the rule imposes no such requirement.[6] *See supra* ¶ 42.

¶46    This ability—indeed, obligation—to assess harm as of a date *later* than the date the disclosure violation was committed thus allows a court, before ordering full exclusion of a witness or other evidence, to consider the imposition of measures short of full exclusion that are designed to eliminate whatever harm might have originally been present. If those measures succeed in curing the harm, then the violation was indeed harmless and no further sanction is warranted. On the other hand, if those measures are not complied with or do not succeed in eliminating the harm, then harm remains and exclusion would be appropriate.

---

6. It is worth noting that federal courts—interpreting a similar but not identical rule—have incorporated consideration of post-disclosure-violation events into their harmlessness test. *See, e.g., Woodworker's Supply, Inc. v. Principal Mutual Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (explaining that in deciding "whether a Rule 26(a) violation is justified or harmless," "the ability of the [disclosing] party to cure the prejudice" is a factor that should guide the court's discretion (cleaned up)).

¶47    Thus, even though the rule 26(d)(4) exclusionary sanction is sometimes described as "mandatory" rather than "discretionary," district courts nevertheless possess discretion—when assessing discovery and disclosure violations under rule 26—to select an initial sanction short of exclusion that, if executed, would serve to render a disclosure violation harmless. And this is important, because sometimes exclusion of a witness or document—while not in and of itself a dispositive ruling—will necessarily (and perhaps indirectly) result in the dismissal of a case; in one common scenario in which this dynamic arises (as in this case), the matter being considered for exclusion is an expert witness whose testimony is crucial to a party's case. In some other jurisdictions, a discovery sanction in a civil case that effectively "terminate[s] the presentation of the merits of a party's claims" is referred to as a "death penalty" sanction. *See, e.g.*, *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 845 (Tex. 1992). In situations in which an exclusionary sanction would result in dismissal of a case, courts must exercise their discretion wisely, and where possible they should not impose the civil litigation equivalent of the death penalty for discovery offenses that amount to misdemeanors. *See Coroles*, 2015 UT 48, ¶¶ 25, 29 (assessing a court's sanctions order under rule 16 and stating that "where the exclusion of an expert is tantamount to the dismissal of the lawsuit, . . . the district court should exercise restraint in choosing this grave step rather than a lesser sanction"); *De La Cruz*, 2024 UT App 18, ¶¶ 38–39 (Harris, J., concurring) (assessing a court's sanctions order under rule 26 and stating that "[b]efore closing the courthouse door entirely to a party's claim, courts should explore the possibility of" imposing a penalty short of exclusion that serves to ameliorate any harm, with the aim of "deciding cases on their merits" where possible); *cf. Ohio Sec. Ins. Co. v. Best Inn Midwest, LLC*, 143 F.4th 784, 788 (7th Cir. 2025) (stating that a discovery sanction "should be proportionate to the infraction"); *Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1312 (D.C. Cir. 2021) ("Choosing a sanction should be guided by the concept of proportionality between offense and sanction." (cleaned up)).

¶48   In this case, the Al-Imaris' rule violation was relatively minor, the harm (if any) sustained by UDOT and Staker was slight, and other non-dispositive measures were readily available—and were indeed offered by the Al-Imaris—that would have cured any prejudice. In this situation, the district court exceeded its discretion by selecting a sanction—exclusion of Expert—that resulted in dismissal of the Al-Imaris' lawsuit.

¶49   We have already explained why we think the Al-Imaris' rule violation was on the less-egregious end of the spectrum. *See supra* ¶¶ 29–32. And for similar reasons, we do not think it appropriate here to characterize any harm sustained by UDOT and Staker as severe. In its ruling, the district court did not say much about what specific harm UDOT and Staker supposedly suffered; all the court tells us is that UDOT and Staker were unable to "act on the designation provided." But in reality, they *were* able to make a report-or-deposition choice based on the designation provided, as evidenced by the fact that they actually did make such a choice (choosing "report") the day after filing their motion to strike. To be sure, UDOT and Staker claimed then, and are still claiming now, that this choice was made based on incomplete information, and that they chose "the lesser of two evils" because they didn't feel like they could adequately prepare for a deposition based on the designation offered. But the district court didn't explain why it found this argument persuasive, and we are less receptive to this argument than the district court was.

¶50   Indeed, as discussed above, UDOT and Staker had—as a practical matter—a lot of information upon which to exercise a meaningful election between a report and a deposition. They had Expert's curriculum vitae and testifying history, as well as the compensation structure in effect with the Al-Imaris. They knew that Expert was a "licensed professional engineer with expertise in vehicle collision reconstruction, commercial vehicle crash investigation and analysis, roadway design, . . . traffic controls, . . . and automotive safety and design issues." And given that all of

the Al-Imaris' other designated experts were non-retained medical or mental health professionals, UDOT and Staker knew that Expert was a critical witness; in particular, they knew that Expert was the Al-Imaris' sole negligence and accident-causation expert and that he would be offering opinions about a range of topics, including "the obligations of construction contractors in sealing roadways, signage requirements, Utah regulations relating to roadway surfacing, and safety conditions necessitated by weather," as well as a general opinion about "the factors contributing to the underlying accident." And they knew that Expert's opinions would be based on and supported by twelve specific categories of documents and materials. It is true that the designation did not come right out and say that Expert would opine that UDOT and Staker had *breached* any such obligations, or even that UDOT and Staker had done anything to contribute to the accident; it is for this reason that the designation is deficient, as previously discussed. But in context, UDOT and Staker had to know that Expert would be offering opinions in the Al-Imaris' favor on these points, even if they did not know much about the details of those opinions. The lack of detail, however, is not really the problem with the designation; as already noted, *see supra* note 4, UDOT and Staker were not—at the designation stage—entitled to much detail about those opinions. Based on our review of the record, we conclude that UDOT and Staker had a lot of information at their disposal that informed their decision about whether to select "report" or "deposition" with regard to the Al-Imaris' sole negligence and accident-causation expert. They were certainly not making that decision in a vacuum. We therefore consider it something of a stretch for UDOT and Staker to claim—as they did before the district court—that they could not "determine if a deposition [was] needed" or that "there was no way to prepare for a deposition."

¶51 Moreover, by the time their motion to exclude came on for a hearing, UDOT and Staker had had Expert's full report in their possession for several weeks, and that report gave them much

more than just a "brief summary" of Expert's opinions—it gave them those opinions in their entirety.[7] Thus, by the time the court was asked to make a decision as to harmlessness, UDOT and Staker were in possession of all information—and then some—that our expert designation rules require the Al-Imaris to provide.

¶52    In addition, it is worth noting that UDOT and Staker filed their motion—asking for total exclusion of Expert as a witness—just thirteen days after receiving the designation, and well before any of the following events had taken place: receiving Expert's report, taking Expert's deposition, the expiration of the expert discovery period, or the setting of a trial date. Thus, this is not a case in which UDOT and Staker had expended significant resources—or any resources at all, really—going down a path laid for them by their litigation opponents that was later determined to be irrelevant or ill-advised. *Compare De La Cruz*, 2024 UT App 18, ¶ 19 (noting that the defendant had "created and executed on a discovery and litigation plan" that was premised on representations the plaintiff made, and that the defendant sustained harm when the plaintiff made a late disclosure of additional damages). Nor is this a case where a disclosure occurred on the eve of trial, requiring the opposing parties to re-evaluate their litigation strategy late in the game. *Compare Erickson*, 2022 UT App 27, ¶¶ 27–28 (holding that the untimely

---

7. Before the district court, the Al-Imaris did not argue that service of the full-blown report—which took place prior to the hearing on the motion to strike—functioned as a sort of supplementation of their deficient expert designation. *See* Utah R. Civ. P. 26(d)(5) (stating that parties who learn that their disclosures are "incomplete or incorrect in some important way" must "timely" supplement those disclosures). We therefore need not weigh in on the question, other than to again note that, in assessing harmlessness under rule 26(d)(4), a court may take into account events that have occurred since the faulty designation, including any attempts to supplement improper or incomplete disclosures.

disclosure of a valuation expert and the service of the expert's written report a mere five days before trial over a holiday weekend "deprived [the opposing party] of a reasonable opportunity to prepare to rebut the newly disclosed expert's testimony" and therefore was not harmless).

¶53 Finally, any harm sustained here by UDOT and Staker could have been entirely ameliorated with simple measures well short of exclusion of Expert's testimony and eventual dismissal of the Al-Imaris' case. Indeed, one such measure was suggested by the Al-Imaris at the oral argument: allowing UDOT and Staker, already armed with Expert's report, to take Expert's deposition, presumably at the Al-Imaris' expense. We agree with the Al-Imaris that this lesser sanction would have completely ameliorated any harm sustained by UDOT and Staker.

¶54 Under the unique circumstances of this case, the district court exceeded its discretion by determining that the harm in this case was severe enough to justify a sanction amounting to dismissal of the Al-Imaris' case.[8] It wasn't. To be sure, the Al-

---

8. Our precedent is not to the contrary. In particular, *Johansen v. Johansen*, 2021 UT App 130, 504 P.3d 152; *Hansen v. Kurry Jensen Properties LLC*, 2021 UT App 54, 493 P.3d 1131; and *Segota v. Young 180 Co.*, 2020 UT App 105, 470 P.3d 479, are all easily distinguishable from the facts of this case. In each of those cases, the discovery violation was the biggest and most egregious one possible: the utter and complete failure to make any disclosure at all. *See Johansen*, 2021 UT App 130, ¶ 14 ("[I]t is undisputed that [the disclosing party] completely failed to file his rule 26 initial disclosures detailing the witnesses or the material supporting his claim."); *Hansen*, 2021 UT App 54, ¶ 42 (observing that the disclosing party had "blow[n] off rule 26's initial disclosure requirements in their entirety"); *Segota*, 2020 UT App 105, ¶ 3 (explaining that the disclosing party "did not serve initial

(continued…)

Imaris' designation was out of compliance with the rule, and the court certainly had a measure of discretion in assessing harm and in evaluating how to address any such harm. But courts must exercise their discretion "with reason and in good conscience, and with an understanding of and consideration for the rights of the parties, for the purpose of serving the always desired objective of doing justice between them." *Davis v. Riley*, 437 P.2d 453, 455 (Utah 1968). Just as district courts may exceed their discretion in discovery-related matters by issuing too lenient a ruling, *see Johansen*, 2021 UT App 130, ¶ 19, so too can they exceed their discretion by issuing too harsh a ruling.[9] In this case, the Al-

disclosures at all, at least not until after the fact discovery deadline had run"). By contrast, the Al-Imaris' discovery sin was far less egregious. Moreover, the harm sustained by the nondisclosing parties in those cases from the complete failure to disclose was arguably greater than that sustained by UDOT and Staker here, where UDOT and Staker had quite a bit of information at their disposal from which they could make their election. Thus, on both relevant factors—the egregiousness of the violation and the level of harm sustained—this case is materially different.

9. Unlike our dissenting colleague, we highly doubt that our decision will "cause confusion among district courts and practitioners alike." *See infra* ¶ 103. Indeed, we have confidence that—both before and after the guidance we give here—trial judges have and will "exercise [their] discretion in ways commensurate with both justice and mercy." *See De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 30, 545 P.3d 285 (Harris, J., concurring). Moreover, we see zero possibility that our ruling in this case will usher in a "return[] to the days of [trial by] ambush" by litigants who will redouble their efforts to "game the system." *See infra* ¶ 105. We see it as extremely unlikely that disclosing parties would ever try to game the system by making purposely incomplete disclosures, while hoping that a merciful trial judge

(continued…)

Imaris' violation was on the less-egregious end of the spectrum, and the harm (if any) sustained by UDOT and Staker was minimal; the situation therefore did not call for imposition of the civil litigation equivalent of the death penalty.

¶55   We therefore reverse the order excluding Expert from testifying at trial, and we remand the case to the district court for reassessment of the harmlessness inquiry and for reassessment of what proportional measures might be taken to ameliorate any specific harm found to have been sustained by UDOT and Staker as a result of the Al-Imaris' disclosure violation. On remand, the district court will continue to have a measure of discretion to determine "harmlessness" and, if it determines that some harm has occurred, to select appropriate measures to ameliorate it. But on this record, that discretion is not broad enough to permit it to impose the ultimate sanction of exclusion and dismissal.

## II. The Summary Judgment Order

¶56   Having determined that the district court exceeded its discretion by striking the Al-Imaris' designation of Expert, we next address the Al-Imaris' challenge to the district court's order granting summary judgment in UDOT and Staker's favor.

¶57   In this case, the court's summary judgment order was premised on its earlier order barring Expert from testifying at

would bail them out later. We see it as much more likely—and, by some accounts, already happening in some cases—that recipient parties will try to flyspeck the other side's disclosures and designations and then "just feign[] harm for the purposes of trying to get" their opponent's "claims dismissed on non-merits grounds prior to trial." *See Butler v. Mediaport Ent. Inc.*, 2022 UT App 37, ¶ 48, 508 P.3d 619. Trial courts, in exercising their discretion in this context, should be no more credulous of recipient parties' claims of harm than they are of disclosing parties' excuses for nondisclosure.

trial. The court ruled that "this is the type of case which requires an expert opinion or opinions as to the proper standard of care" applicable to UDOT and Staker's actions regarding road conditions, signage, etc. The court explained that "the understanding of these duties is beyond the grasp of a typical jury and requires [the] specialized knowledge of an expert." And the court found that, with no expert witness to testify about the standard of care applicable to UDOT and Staker, the Al-Imaris could not prove their claims; without such an expert, there was "no evidence that UDOT or Staker created the dangerous condition" on the road or that "it was a dangerous condition that caused . . . [Jeddie] Al-Imari to lose control of his vehicle." Accordingly, the court granted UDOT and Staker's motion for summary judgment.

¶58    But now that we have reversed the district court's order forbidding Expert from testifying at trial, the summary judgment landscape has changed. It is no longer true that the Al-Imaris have "no evidence" regarding negligence and causation.[10] The court's summary judgment order was based on a premise—that Expert would not be allowed to testify—that is no longer accurate. Accordingly, we must vacate that order and remand the case for further proceedings. On remand, UDOT and Staker will be free to renew their motion for summary judgment, but that motion will need to be evaluated with Expert's testimony in the mix, and we of course express no opinion on how any such renewed motion should be decided.

CONCLUSION

¶59    Because the Al-Imaris' expert designation did not include a brief summary of Expert's opinions, it did not meet all the

---

10. For this reason, we need not address the Al-Imaris' contention that even without Expert's testimony, there existed enough other evidence for their case to survive summary judgment.

requirements of applicable rules. But the deficiencies in the Al-Imaris' disclosure—if they caused harm at all—did not result in the type of harm egregious enough to warrant the sanction of full exclusion (and, indirectly, dismissal of their case). While the district court had a measure of discretion to select an appropriate sanction for the Al-Imaris' noncompliance, the court exceeded that discretion, on this record, by imposing a sanction that effectively closed the courthouse doors to the Al-Imaris.

¶60    Accordingly, we reverse the court's order excluding Expert from testifying at trial, and we vacate the court's order granting summary judgment in favor of UDOT and Staker. We remand the case for further proceedings consistent with this opinion, including reassessment of whether an appropriate non-terminating sanction should be imposed as a penalty for the Al-Imaris' noncompliance, and including assessment of any renewed motion for summary judgment that any of the parties might file.

--------

MORTENSEN, Judge (dissenting):

### INTRODUCTION

*More complete disclosures increase the likelihood that the case will be resolved justly, speedily, and inexpensively. Not being able to use evidence that a party fails properly to disclose provides a powerful incentive to make complete disclosures.* **This is true only if trial courts hold parties to this standard**. *Accordingly, although a trial court retains discretion to determine how properly to address this issue in a given case, the usual and expected result should be exclusion of the evidence.*

Utah R. Civ. P. 26 advisory committee's note to
2011 amendment (emphasis added)

¶61     Rule 26(d)(4) of the Utah Rules of Civil Procedure explains that "[i]f a party fails to disclose or to supplement timely a disclosure or response to discovery, that party *may not* use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." (Emphasis added.) In following both the rule and the advisory committee's note, our precedent has firmly established that where a disclosure is deficient, exclusion is presumed. Today, however, the majority holds that a district court abuses its discretion and commits reversible error merely by following the rule and our precedent.[11] I simply cannot agree on this fundamental point and therefore respectfully dissent.

¶62     I begin by articulating the appropriate standard of review. Next, I assess the Al-Imaris' failure to disclose in this case, which was more than a mere technical failure. I proceed to explain how the majority opinion is at odds with the plain text of the rule. I then summarize the precedent of our appellate courts on these issues, which forecloses the majority's holding in this case. I then explain that these principles allow for the admittedly harsh result in this case, namely exclusion of Expert's testimony. I then discuss

---

11. As I understand it, the majority opinion articulates a rule that can be distilled into five principles. First, it removes the presumption of exclusion for a failure to disclose from rule 26(d)(4). Second, it mandates that a judicial assessment of good cause or harmlessness under rule 26(d)(4) be made not as of the time of the deficient disclosure but instead as of the time the district court rules on exclusion. Third, exclusion isn't presumed even if some harm still exists at the time the court rules on exclusion. Fourth, the rule downplays language from prior cases that a district court has no duty to blunt or ameliorate the harm associated with a deficient disclosure. And, relatedly, fifth, "failure is harmless" really means "the failure can be made harmless," whether by the district court or the nondisclosing party.

what I think the practical consequences of the majority's holding to the contrary will be. Finally, I explain why summary judgment was appropriate without Expert's testimony.

ANALYSIS

I. Standard of Review

*Skeptics believe that appellate standards of review do not really matter; that appellate judges pay lip service to standards of review but then decide cases as they please without real regard for the applicable standard of review. Our votes in this case demonstrate that standards of review really do matter.*

*Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶ 21, 361 P.3d 703 (Orme, J., concurring, joined by Toomey, J.)

¶63    The majority's statement of the standard of review is correct but incomplete. And it matters. The majority correctly states that we review (1) whether a party's disclosure was inadequate for correctness as it involves an interpretation of a rule of civil procedure and (2) a district court's determination that a deficient disclosure was harmful for an abuse of discretion.[12] *See*

_____

12. As an initial matter, it seems to me that the majority unduly constricts the permissive scope of discretion in this context. The majority quotes a supreme court case for the following:

> It is true that where the authority to perform a proposed action rests within the discretion of the court we must allow considerable latitude in which [the court] may exercise [its] judgment. But this does not mean that the court has unrestrained power to act in an arbitrary manner. . . . The meaning of the

(continued…)

*supra* ¶ 16. We also afford significant discretion to trial courts on their sanctions decisions—the real heart of the issue presented in this appeal. We will not disturb a court's sanctions ruling unless an "abuse of discretion is *clearly* shown." *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 (cleaned up); *see also Raass Bros. Inc. v. Raass*, 2019 UT App 183, ¶ 11, 454 P.3d 83; *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶ 9, 370 P.3d 963. This "deferential review" accounts for the reality that "trial courts must deal first hand with the parties and the discovery process." *Kilpatrick*, 2008 UT 82, ¶ 23 (cleaned up).

¶64 Stated otherwise, a district court's sanctions ruling is a "discretionary call." *De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 11, 545 P.3d 285 (cleaned up). And we have specifically noted that we will affirm a discretionary call even where we might have reached a different decision. *Id.*; *Hansen v. Kurry Jensen Props. LLC*, 2021 UT App 54, ¶ 25, 493 P.3d 1131; *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶¶ 21–24, 361 P.3d 703 (Orme, J., concurring, joined by Toomey, J.); *England*

---

term "discretion" itself imports that the action should be taken within reason and good conscience in the interest of protecting the rights of both parties and serving the ends of justice. It has always been the policy of our law to resolve doubts in favor of permitting parties to have their day in court on the merits of a controversy.

*Supra* ¶ 37 (alterations and omission in original) (quoting *Carman v. Slavens*, 546 P.2d 601, 603 (Utah 1976) (cleaned up)). Fair enough. What the majority neglects to mention, however, is that the *Carman* court—in the very same paragraph—stated that "[t]he language of the rule as presently worded is permissive, rather than mandatory," which was what gave the court the "discretionary authority to impose" the challenged sanctions in the first place. *Carman*, 546 P.2d at 603.

*Logistics, Inc. v. Kelle's Transport Service, LLC*, 2024 UT App 137, ¶ 59, 559 P.3d 45.

¶65 As I will discuss in more detail, the significant discretion at play here is coupled with a presumption of exclusion. Properly applied, the standard of review allows for but one outcome in this case: affirming the district court's decision to exclude Expert's testimony.

## II. Failure to Disclose

### *The Disclosure Failed Completely to Disclose the Most Important Thing: An Opinion.*

¶66 I agree with one discrete, but significant, holding of the majority opinion: "[T]he district court committed no error in concluding that the Al-Imaris' designation of Expert did not comply with the rule."[13] *See supra* ¶ 31. I part ways with the rest of the majority's analysis, however, because the deficient disclosure was neither harmless nor accompanied by a showing of good cause.[14] Consequently, the presumed sanction was exclusion, and the district court should be affirmed in this regard.

¶67 Pertaining to experts, rule 26(a)(4)(A)(ii) of the Utah Rules of Civil Procedure requires a party to, "without waiting for a discovery request, serve on the other parties . . . a brief summary of the opinions to which the witness is expected to testify." The

---

13. Of course, the rule does not speak of mere "designation." It speaks instead of disclosure. In other words, it is not just the name and qualifications of the expert that are required but also—and even more importantly—a summary of his or her anticipated *opinion*. *See* Utah R. Civ. P. 26(a)(4)(A).

14. As the majority notes, *supra* ¶ 34, the Al-Imaris do not contend that their deficient disclosure was excused by good cause.

Al-Imaris' disclosure summarized Expert's anticipated testimony as follows:

> [Expert] is expected to testify regarding the conditions present at the incident site, the obligations of construction contractors in sealing roadways, signage requirements, Utah regulations relating to roadway surfacing, and safety conditions necessitated by weather. Expert is also expected to testify regarding the factors contributing to the underlying accident.

As noted, the majority correctly observes that this disclosure was deficient.[15] Indeed, the most important part—a summary of Expert's opinion—was omitted. Instead, the disclosure included nothing but the kind of "broad, conclusory statements" that we said weren't good enough in *RJW Media v. Heath*, 2017 UT App 34,

---

15. Throughout the main opinion, the majority goes to great lengths to call the deficient disclosure something other than deficient, all in an effort to downplay the complete failure to disclose *any* opinion whatsoever. *See, e.g., supra* ¶ 32 ("[T]his case does not involve a complete failure to disclose, but instead involves an infirmity contained within a timely disclosure that was otherwise completely in compliance . . . ."); *supra* ¶ 23 ("[T]he designation was not entirely in compliance with the rule's requirements."); *supra* ¶ 24 (stating that the "designation" failed to "strictly comply" with rule 26(a)(4)(A)); *supra* ¶ 25 ("[The] designation . . . was compliant with the rule in *nearly* every respect."); *supra* ¶ 29 ("[T]he Al-Imaris wouldn't have needed to do much to bring this disclosure into compliance."); *supra* ¶ 48 ("[T]he Al-Imaris' rule violation was relatively minor . . . ."). One can characterize it any way one wants, but this much is clear: as it pertains to identifying any opinion whatsoever, the Al-Imaris' disclosure was a complete failure.

¶ 26, 392 P.3d 956 (cleaned up).[16] The "summary" of Expert's opinion would have required UDOT and Staker to parse the complaint and the initial disclosures to make certain guesses about how Expert was going to testify, such as how fast the Al-Imaris' car was traveling at the time of the incident, whether it was raining, and whether some substance on the road, such as oil, caused the car to slide.

¶68    The majority suggests that UDOT and Staker could have easily inferred all this because they "knew that Expert was going to be the Al-Imaris' sole negligence and accident-causation expert." *Supra* ¶ 30. I would not impose such a guessing game on litigants, especially in this case, where the disclosure contained neither the word "negligence" nor the word "causation." At the very least, no one can dispute that it would have been much easier for the Al-Imaris to provide the necessary information in the first place, given that they presumably knew the substance of Expert's testimony.

---

16. The majority also astutely notes that one sentence in the disclosure "is dangerously similar to a sentence that the drafters of rule 26 indicated would not be sufficient in this context." *Supra* note 3. The sentence says, "Expert is also expected to testify regarding the factors contributing to the underlying accident." Nonetheless, the majority suggests that this disclosure was closer to harmless than harmful because "it wouldn't have taken all that much to bring the designation into compliance; a sentence or two stating, for instance, that Expert would opine that UDOT and Staker's actions in breaching the standard of care proximately caused the Al-Imaris' accident would likely have sufficed." *Supra* note 3. This disclosure was not merely dangerously close to what the drafters of rule 26 identified as deficient; it was *exactly* what the drafters—and our subsequent precedent—have identified as deficient.

¶69 More generally, the majority attempts to mitigate the problems associated with a complete failure to disclose an opinion by asserting that the purpose for the requirement that an opinion be disclosed is to assist in the recipient's determination of whether to seek a report from or depose the expert witness. *See supra* ¶ 22. This perspective misses the mark. Without an opinion in the disclosure, the opposing party must make its decision completely in the dark. And, as the majority recognizes, the receiving party has "*just* fourteen days" to make this decision. *Supra* ¶ 21 (emphasis added) (citing Utah R. Civ. P. 26(a)(4)(C)(i)). If the party fails to do so, then it *may not* take any additional discovery from the expert. *See* Utah R. Civ. P. 26(a)(4)(C)(i) ("If no election is served on the other parties, then no further discovery of the expert must be permitted.").

¶70 When a party with the burden of proof on an issue serves its initial expert disclosures, it triggers a cascade of other deadlines. A party electing a deposition must depose that expert within forty-two days. *See id.* In practice, this period will frequently lapse before a motion to exclude can even be briefed and argued. Under the majority's approach, a district court will likely need to make a finding of harmlessness because the opposing party will have already taken the expert's deposition or received the report. *See supra* ¶ 53 (describing a measure "short of exclusion" that the district court could have ordered to remedy the Al-Imaris' deficient disclosure, namely allowing UDOT and Staker "to take Expert's deposition, presumably at the Al-Imaris' expense").

¶71 And although a party that doesn't bear the burden of proof on an issue technically has fourteen days after receiving an expert report or taking a deposition to serve its initial disclosures, *see* Utah R. Civ. P. 26(a)(4)(C)(ii), the reality is that the party is determining whether it needs expert rebuttal based largely on the opposing party's initial disclosure. Given the tight deadlines a responding party will soon face in providing their own expert

disclosures, the work to identify, retain, and get the expert working on the case commences immediately. The majority overlooks this reality of litigation. Under the majority's approach, opposing parties will effectively need to further guess the substance of the expert testimony they need to rebut. And, thus, the harm visited on the recipient party is real and ongoing.[17]

¶72   In sum, the short deadlines contemplated by rule 26(a)(4)(C) are indicative of the supreme court's intent that proper and sufficient disclosures be made, not that a circus sideshow ensue. The deadlines are meant to expedite the expert discovery process so that cases can go to trial. As I explain below, the majority's approach encourages subterfuge by all sides, and it is therefore inconsistent with the general purpose of the rules of civil procedure, which is "to achieve the just, speedy, and inexpensive determination of every action." Utah R. Civ. P. 1.

### III. Plain Language

*We interpret court rules, like statutes and administrative rules, according to their plain language. Courts are, in short, bound by the text of the rule.*

*Strand v. Nupetco Assocs. LLC,*
2017 UT App 55, ¶ 4, 397 P.3d 724 (cleaned up)

¶73   "Trial courts have broad discretion in managing the cases before them . . . ." *Solis v. Burningham Enters. Inc.*, 2015 UT App 11, ¶ 12, 342 P.3d 812 (cleaned up). As noted, this broad discretion generally applies to a trial court's sanctions ruling. *See supra*

---

17. The majority's reasoning provides an end-run around any requirement to disclose experts by a deadline. The disclosing party is now free to provide half-baked disclosures—even disclosing no opinion whatsoever—and find comfort in the fact that they can cure the material violation of the rule at some future time.

¶¶ 63–64. In some cases, however, the plain language of the applicable rule specifies the action the district court must take when a party runs afoul of our discovery rules. Rule 26(d)(4) is one such provision.

¶74  We construe our rules of civil procedure "according to their plain language." *Strand v. Nupetco Assocs. LLC*, 2017 UT App 55, ¶ 4, 397 P.3d 724 (cleaned up). Rule 26(d)(4) provides that "[i]f a party fails to disclose or to supplement timely a disclosure or response to discovery, that party *may not use* the undisclosed witness, document, or material at any hearing or trial unless the failure *is* harmless or the party shows good cause for the failure." Utah R. Civ. P. 26(d)(4) (emphasis added). The linguistic structure of rule 26(d)(4) admits only one plain meaning. The condition of being "harmless" is contemporaneous with the failure to properly disclose. In simple terms, the rule says that improperly disclosed evidence cannot be used if the failure to disclose is harmful when the failure happened.

¶75  In contrast to what the plain syntax of the rule indicates, the majority seeks to impose a linguistically unnatural temporal aspect in reading the verb clause "is harmless." In the majority's words,

> [H]armlessness . . . is to be assessed as of the time the court makes its decision, and *not* as of the time the disclosure violation occurred. From a textual standpoint, the rule uses present tense and asks a district court to determine whether "the failure *is* harmless."

*Supra* ¶ 42 (quoting Utah R. Civ. P. 26(d)(4)). The majority proceeds to find support for its reading in the "similar context[]" of a child welfare case, explaining that "the verb 'is,' when used in statutes calling for a judicial determination, requires a court to conduct a 'present-tense analysis' as of the date of the determination in question." *Supra* ¶ 42.

¶76 The majority's reading does not pay adequate attention to the syntactical and linguistic structure of the rule. The structure of the rule in no way suggests that being harmless is limited to a one-time occurrence that may later cease to exist. The majority attempts to cabin the temporal aspect of harmlessness to conditions at the time the court makes a ruling. But that is not what the rule says. Rather, by its use of the verb clause "is harmless," the rule conceives of the condition of harm as arising contemporaneously with the deficient disclosure—in other words, before the date of the district court's determination on harmlessness. This harm may or may not be ongoing, but that doesn't change the fact that the harm arose out of the failure to disclose. Notably, the rule states that the improperly disclosed material may be used only if the "*failure* [to properly disclose] is harmless." Utah R. Civ. P. 26(d)(4) (emphasis added). Thus, it is the "failure" itself that must be "harmless"—and that failure can logically occur only at the time the deficient disclosure was made (since that is when the failure took place). The plain language of the rule thus leaves room for only one conclusion: the harm is that which arises at the time of the failure to disclose. On a perhaps more esoteric level, rule 26(d)(4) conceives of harm that belongs to the essence of a deficient disclosure. And it is by showing the opposite—namely, that in a particular instance no harm accompanied the deficient disclosure—that the failure to properly disclose "is harmless."[18]

---

18. For these reasons, the majority's claim that a child welfare assessment is analogous to a harmlessness determination in the context of a discovery violation misses the mark. While it makes sense to assess the child's best interest as of the time of the proceeding because a child's welfare is, obviously, ongoing, *see supra* ¶ 42, the same reasoning falls flat when applied to a past event. As I have explained, a "failure" to disclose is something that has necessarily happened in the past.

¶77    The very next subsection of rule 26(d) makes this reading even more clear. And, of course, we read the rule as a whole. *See LPI Services v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 ("We read the plain language of the statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters." (cleaned up)). Rule 26(d)(5) provides, "If a party learns that a disclosure or response is incomplete or incorrect in some important way, the party must timely serve on the other parties the additional or correct information if it has not been made known to the other parties. The supplemental disclosure or response must state why the additional or correct information was not previously provided." Utah R. Civ. P. 26(d)(5). The rule, by its plain language, places the burden in the present tense on the disclosing party to notify the opposing parties of the deficiency and provide a supplement and explain why the complete information was not previously provided. It does not place the burden on the court to point out why the disclosure was deficient at some future time.

¶78    Thus, the rule's plain text suggests that its drafters also contemplated that parties would make deficient disclosures, and they specified the procedure to be followed in that situation. They made clear that it would be up to the disclosing party to correct a deficient disclosure, *see id.*, and that is the course of action the Al-Imaris could have and should have taken upon learning that their disclosure was deficient. The majority has disregarded this express directive and instead fashioned a rule that renders this subsection of the rule essentially superfluous. Under rule 26(d)(5), a party must not only correct its deficient disclosure—it is also *required* to explain why it could not have made a non-deficient disclosure in the first place. This the Al-Imaris never did, and that should matter. Under the majority's approach, however, it does not matter at all. In my view, it makes little sense for the drafters to have dictated a clear and specific procedure for remedying a deficient disclosure only to have the majority disregard that procedure in the instant case.

¶79 Given the temporal aspect of the harm caused by deficient disclosure, the plain language of rule 26(d)(4) allows for a single result in a case where a failure to disclose is excused by neither good cause nor harmlessness as of the time of disclosure: exclusion of the challenged evidence.

¶80 The majority concedes that rule 26(d)(4)'s plain language is of the "mandatory" type. *Supra* ¶ 40. In the majority's view, however, district courts need not always "order full exclusion of a witness or document in every single case in which a non-disclosing party sustains some modicum of harm at the moment the disclosure violation occurred." *Supra* ¶ 40. In fact, the majority holds that trial courts commit reversible error in certain circumstances when they follow the plain language of rule 26(d)(4). *See supra* ¶ 39 (holding that the district court abused its discretion "by imposing a disproportionate sanction—exclusion and dismissal—that was not warranted by the severity of the violation"). What the majority really seems to be saying is that a district court has the discretion—and now, in some cases, the affirmative obligation—not to exclude a witness or material under rule 26(d)(4) if a deficient disclosure can *be made* harmless.[19] *See supra* ¶ 41 ("Where measures short of exclusion are imposed that entirely ameliorate any harm caused by the disclosure violation, the violation becomes harmless, and in such cases the rule allows for no further sanction (e.g., exclusion) to be imposed."). To arrive at this conclusion, the majority glosses over the plain language of

---

19. The majority also suggests that if a deficient disclosure is only somewhat harmful, a trial court lacks the discretion to exclude the evidence. *See supra* ¶ 55 (noting that, even if the district court "determines that some harm has occurred" after the case has been remanded, it will not have the discretion "to impose the ultimate sanction of exclusion and dismissal"). But the rule doesn't speak to degree. Either a deficient disclosure is harmful or it's not. In any event, where no opinion is disclosed at all, the disclosure is not minimally harmful.

the rule and most of the advisory committee's note and implicitly hangs its hat on the "discretion" language found in the note's final sentence. *See* Utah R. Civ. P. 26 advisory committee's note to 2011 amendment (noting that "although a trial court retains discretion to determine how . . . to address" a failure to properly disclose, "the usual and expected result should be exclusion of the evidence").[20]

¶81 The majority also adds substantive content to the rule found nowhere in its language, holding that the point in time to determine harm or good cause is not when the disclosure is made but, instead, as of the time of the hearing at which the district court addresses exclusion. *See supra* ¶ 42. And even then, if some harm still exists, a district court must nonetheless assess whether the harm can be ameliorated before ordering exclusion. *See supra* ¶ 55.

¶82 In sum, the majority's assertion that courts should focus on what has occurred since the motion to strike the relevant witness or expert is filed lacks basis in the plain language of the rule and, as I explain in the next part, in our precedent.

---

20. When the unambiguous language of the rule and the advisory committee's note conflict, the note must give way to the rule. *See, e.g., Belnap v. Howard*, 2019 UT 9, ¶ 15, 437 P.3d 355 ("We generally do not look to advisory committee notes or other sources of interpretive guidance when the language of the statute is plain. Because the language of rule 26(b)(1) is plain, if we consider the [legislative] note [accompanying the rule] to be the equivalent of an advisory committee note, it would be improper to consider it." (cleaned up)). In my view, the portion of the committee's note on which the majority relies is plainly inconsistent with the unambiguous language of the rule, which, again, the majority concedes is mandatory. *Supra* ¶ 40.

IV. Precedent

*Here, also, the applicable provision of law is beyond dispute.*

*Burnet v. Coronado Oil & Gas Co.*,
285 U.S. 393, 411 (1932) (Brandeis, J., dissenting)

¶83    The majority disregards principles of horizontal stare decisis and brushes aside years of precedent. "Stare decisis is a cornerstone of Anglo-American jurisprudence because it is crucial to the predictability of the law and the fairness of adjudication." *State v. Legg*, 2018 UT 12, ¶ 9, 417 P.3d 592 (cleaned up). "Horizontal stare decisis" refers to the principle "that one panel of this court is bound to follow the previous decisions of another panel of this court, unless we make a specific decision to overrule or disavow the earlier precedent." *In re adoption of BNA*, 2018 UT App 224, ¶ 22, 438 P.3d 10. To be sure, however, "horizontal stare decisis only applies if the previous precedent remains robust." *Id.*

¶84    In *RJW Media Inc. v. Heath*, we explained that our discovery "rules embrace the idea of competing risks" and that "[a] disclosing party who endeavors, by stratagem or otherwise, to disclose as little as possible faces a significant risk that the disclosure will be found insufficient and the evidence or the witness may not be allowed." 2017 UT App 34, ¶ 30, 392 P.3d 956. We also stated that an expert designation should include "specific facts and opinions . . . so that parties can make better informed choices about the discovery they want to undertake or, just as important, what discovery they want to forgo." *Id.* ¶ 25.

¶85    To be absolutely clear, *RJW Media* remains robust. *See S6, LLC v. Wing Enters., Inc.*, 2024 UT App 105, ¶ 55, 556 P.3d 100; *Sabour v. Koller*, 2024 UT App 26, ¶¶ 28–40, 546 P.3d 28; *Dierl v. Birkin*, 2023 UT App 6, ¶ 33, 525 P.3d 127; *Johansen v. Johansen*, 2021 UT App 130, ¶ 32 n.10, 504 P.3d 152; *Hansen v. Kurry Jensen Props. LLC*, 2021 UT App 54, ¶¶ 48–49, 493 P.3d 1131 (Mortensen, J.,

concurring, joined by Pohlman, J.); *id.* n.7 (lead opinion) (noting that concurring opinion in *Hansen* controlled on "those points" where it was "at variance with the discussion" in the lead opinion); *Blank v. Garff Enters. Inc.*, 2021 UT App 6, ¶ 23, 482 P.3d 258; *Black Diamond Fin. LLC v. Big Cottonwood Pine Tree Water Co.*, 2020 UT App 90, ¶ 25, 470 P.3d 445; *Ghidotti v. Waldron*, 2019 UT App 67, ¶ 17, 442 P.3d 1237; *Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 18, 438 P.3d 25, *aff'd*, 2020 UT 59, 472 P.3d 927; *Erickson v. Erickson*, 2018 UT App 184, ¶ 23, 437 P.3d 370.

¶86    *RJW Media* and its progeny strongly suggest that a district court has the affirmative obligation to exclude a witness or evidence if the offending party has failed to demonstrate good cause or harmlessness. *See infra* ¶¶ 87–95. Even the two cases upon which the majority primarily relies held that the district courts appropriately excluded the relevant witnesses or evidence. *See De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 24, 545 P.3d 285; *Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 22, 470 P.3d 479. In short, the majority's rule is inconsistent with all of these cases.

¶87    In *Hansen v. Kurry Jensen Properties LLC*, the trial court had denied a motion to exclude witnesses where the witnesses had not been disclosed. 2021 UT App 54, ¶¶ 5, 7–8, 493 P.3d 1131. The lead opinion acknowledged that rule 26(d) contemplated that exclusion of witnesses would be the expected sanction for a violation of disclosure rules. *Id.* ¶ 25. It also stated that while "another judge might have taken a stricter approach," the defendants could have garnered sufficient information from the complaint. *Id.* ¶ 26. This latter position was rejected by the other two members of the panel. *See id.* ¶ 44 (Mortensen, J., concurring, joined by Pohlman, J.). My concurring opinion on this issue—which then-Judge Pohlman joined—expressly addressed the precedential import of the case and emphasized that had the district court excluded all of the plaintiff's evidence, we would have affirmed. *Id.* ¶ 41. In other words, even if a party can potentially discern who the witnesses might be or what evidence

might be provided, those witnesses or that evidence should nevertheless be excluded where the disclosure rules are violated. *Id.* ¶ 44. In short, the controlling opinion in *Hansen* soundly rejected the idea, which appears to be embraced by the majority in this case, that if a disclosing party *might* show that an "opposing party should have been able to cobble together a prescient picture of the potential evidence or witnesses," then a failure to disclose could be considered harmless. *Id.*

¶88    Just six months later, we recognized the binding nature of the concurring opinion and applied its rationale in *Johansen v. Johansen*, 2021 UT App 130, 504 P.3d 152. There, the district court had determined that a party's failure to disclose was harmless, which this court held erroneous and warranted reversal. *Id.* ¶¶ 19–20. We held that the district court "should have precluded [the disclosing party's] use of the [non-disclosed witness's] testimony due to his clear violation of" rule 26(a)(1)(A)(ii). *Id.* ¶ 19. In so holding, we made a critical observation that is applicable in the instant case: while district courts have significant discretion in determining harmlessness and good cause, rule 26(d)(4) establishes a presumptive sanction of exclusion for a failure to disclose. *Id.* ¶¶ 11, 14. Put bluntly, the district court in *Johansen* was reversed for being too lax in its application of rule 26(d)(4). *See id.* ¶ 33.

¶89    *Johansen* is binding on this court. While that case dealt with the complete failure to disclose as opposed to an inadequate or incomplete disclosure, it is not meaningfully distinguishable from the instant case because the most critical part of the expert disclosure in both cases—any opinion whatsoever—was missing. For this reason, the result should be the same here. In acknowledging the "harsh" result of exclusion, the *Johansen* court "warned once more" that disclosing parties face a significant risk that "untimely, *inadequate*, or skipped" disclosures will be found insufficient and the challenged "evidence or . . . witness may not be allowed." *Id.* ¶ 32 n.10 (emphasis added) (cleaned up).

¶90 The year before *Johansen* was decided, the Utah Supreme Court issued its opinion in *Arreguin-Leon v. Hadco Construction, LLC*, 2020 UT 59, 472 P.3d 927. There the supreme court reviewed a decision of the court of appeals about the disclosure of expert opinion that touched on many of the issues that we address in the instant case. The court grappled with whether an expert could testify at trial to opinions that had not been disclosed where the expert had nonetheless been deposed by the opposing party. *Id.* ¶¶ 21–22. During a sidebar at trial, the defendant's counsel objected that the plaintiff's expert was about to opine on causation, "which 'went beyond any opinion that [the plaintiff] had ever disclosed in [the] case.'" *Id.* ¶ 21. The plaintiff's counsel did not dispute that his question sought an opinion on causation, nor did counsel assert that there had been any disclosure that the expert might opine on causation or that causation had been discussed at the expert's deposition. *Id*. Instead, counsel argued that because the defendant had opted for a deposition, the possible testimony was not limited by disclosures. *Id.* ¶ 22. The trial court agreed with the plaintiff. *Id.* On appeal, the court of appeals reversed. *Id.* ¶¶ 1, 23. The supreme court granted certiorari and affirmed our reversal. *Id*. ¶¶ 1, 42.

¶91 Specifically, the supreme court explained that the process does not become a "free-for-all" just because a party elects to depose an expert. *Id.* ¶ 23. The court based its conclusion on the presumption of exclusion found in rule 26(a)(4), holding that "the district court should not have permitted [the expert] to offer the disputed testimony based on the arguments before it." *Id*. ¶ 25. Even though exclusion of the causation testimony would require a new trial, the court nonetheless determined that it was the proper result. *Id.* ¶ 42.

¶92 Similarly, in *Segota v. Young 180 Co.*, we explained that an opposing party's actual notice of witnesses or potential evidence did not render harmless the disclosing party's failure to comply with the disclosure rules. 2020 UT App 105, ¶ 21, 470 P.3d 479.

The late disclosures in that case turned out to be identical to the opposing party's disclosures. *Id.* Nonetheless, the *Segota* court stated,

> Although the defendants might have—before receiving Segota's disclosures—made some assumptions, or even had suspicions, about the identity of the witnesses and evidence Segota might use in an attempt to prove her claims, they did not actually know the scope of Segota's case until finally receiving her belated disclosures. One party's ability to guess at what the other party's disclosures might be, had they been timely made, does not relieve the other party from its obligation to definitively inform her litigation opponent, through disclosures, about the witnesses and documents she plans to use to prove her case.

*Id*. (cleaned up).

¶93 Although we acknowledged that another judge might have handled the situation differently, *id.* ¶ 22, we did not say that the district court was required to blunt or ameliorate that harm created by the disclosure failure. Indeed, even where an appellate court may have ruled differently, a district court's "discretionary call" will be affirmed in this context. *See, e.g.*, *De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 11, 545 P.3d 285.

¶94 Importantly, the Al-Imaris do not ask us to overrule any of the aforementioned cases. Nor could we overrule the supreme court's decision in *Arreguin-Leon*. *See State v. Dickerson*, 2022 UT App 56, ¶ 36 n.4, 511 P.3d 1191 ("Vertical stare decisis . . . compels a court to follow strictly the decisions rendered by a higher court." (cleaned up)). Thus, the applicable precedent makes clear that the district court should be affirmed in this case. Until now, we have never held that a district court can tailor a sanction short of exclusion when it finds *some* harm under rule 26(d)(4), and we

certainly have never held that a district court *must do so*, nor should we.[21]

¶95 Ultimately, the result in *Segota* obtained even though the outcome was harsh. 2020 UT App 105, ¶ 25. Indeed, without the evidence, the disclosing party could not oppose a motion for summary judgment. *Id.* The court implicitly brushed aside the objection that the result was overly harsh, explaining that "the court's summary judgment decision follow[ed] logically from its imposition of the discovery sanction." *Id.* ¶ 24. The same result should obtain here, harsh though it may be.

## V. A Warning of a Harsh Result

*Implicit in all of this is that neither the district court in this case, nor any district court, is required by the rules to make any attempt to ameliorate or blunt the resultant prejudice which occurs when a party ignores disclosure requirements.*

---

21. The majority claims that "[o]ur precedent is not to the contrary" because the cases I've cited "are all easily distinguishable from the facts of this case." *Supra* note 8. The majority proceeds to claim that "[i]n each of those cases, the discovery violation was the biggest and most egregious one possible: the utter and complete failure to make any disclosure at all." *Supra* note 8. By contrast, the majority says, "the Al-Imaris' discovery sin was far less egregious" because "UDOT and Staker had quite a bit of information at their disposal from which they could make their election" under rule 26(a)(4)(b). *Supra* note 8. To be sure, the issue with the Al-Imaris' disclosure in this case wasn't as egregious as a complete failure to make any disclosure. But they failed to disclose any opinion all the same, making the failure significant. Therefore, the majority's attempt to distinguish the above-cited cases misses the mark.

*Hansen v. Kurry Jensen Props. LLC,*
2021 UT App 54, ¶ 48, 493 P.3d 1131
(Mortensen, J., concurring, joined by Pohlman, J.)

¶96 The district court found that the deficiency in the Al-Imaris' expert disclosure was not harmless. To be sure, the court could have made more specific findings on this point. But the court's ruling must be considered in the appropriate context. In their opposition to the motion to strike and at the hearing on the motion, the Al-Imaris did not specifically argue harmlessness. Instead, they suggested that if the disclosure was in fact deficient, exclusion was not warranted because the court could have ameliorated the harm by ordering them to supplement.[22] This simply wasn't enough to demonstrate harmlessness. *See, e.g., Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶ 18 n.7, 445 P.3d 434 (explaining that "a plain language reading of rule 26(d)(4)" makes clear that "the burden to demonstrate harmlessness or good cause is clearly on the party seeking relief from disclosure requirements").

¶97 On appeal, the Al-Imaris do argue—briefly—that a harmlessness analysis "leans firmly" in their favor because they "requested the opportunity to file a supplemental disclosure." For reasons I have already explained, however, it is not enough merely to offer to supplement a disclosure. Under rule 26(d)(5), the disclosing party "must state why the additional or correct information was not previously provided." Utah R. Civ. P. 26(d)(5). The Al-Imaris didn't offer any such explanation. And, at any rate, the district court properly exercised its substantial discretion in a context where exclusion is presumed. *See Johansen v. Johansen*, 2021 UT App 130, ¶ 14, 504 P.3d 152 (noting that

---

22. The problem is that this is not how the rule works. As discussed, rule 26(d)(5) places the burden on the disclosing party—not the court—to cure its deficient disclosure. *See supra* ¶¶ 77–78.

exclusion of challenged evidence is "presumptive sanction" for failure to comply with disclosure rules). This simply follows from our supreme court's statement in *Keystone* that "sanctions for failure to disclose are required unless that failure is either harmless [or] justified by good cause." 2019 UT 20, ¶ 16 n.4.

¶98   To be sure, the rule speaks to exclusion, not to the consequence of exclusion (e.g., the proverbial civil "death penalty"). But we have previously acknowledged that the consequence for violating our disclosure rules can be harsh. And I think the consequence is implied: let the chips fall as they may. If anyone knows whether evidence or a particular witness is critical to—or even potentially determinative of—a legal claim or defense, it's the disclosing party. That party should therefore be doubly sure that its disclosure is sufficient. On this point, we have expressly counseled that, if anything, a party should over-disclose. *See RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 30, 392 P.3d 956 ("A disclosing party who endeavors, by stratagem or otherwise, to disclose as little as possible faces a significant risk that the disclosure will be found insufficient and the evidence or the witness may not be allowed. To minimize this risk, disclosing parties should be liberally forthcoming rather than minimally compliant and risk the possible consequences of testimony exclusion." (cleaned up)). Here, the disclosing parties were remarkably lackadaisical, given their failure to disclose any opinion whatsoever. And disclosing this extra information would have been so easy that it makes the failure to do so seem all the more conspicuously inexplicable.

¶99   Utah's appellate caselaw repeatedly reflects such harsh results. In addition to *Johansen*, *De La Cruz*, and *Arreguin-Leon*, this court affirmed a grant of summary judgment—obviously a harsh result—where an expert was not disclosed in *Ghidotti v. Waldron*, 2019 UT App 67, ¶ 1, 442 P.3d 1237. One of the plaintiffs, Darnell, desired to testify as a non-retained expert. *Id.* ¶ 7. The Ghidottis maintained that they implicitly disclosed Darnell as an expert

because she was listed "as a potential fact witness in their initial disclosures, . . . she testified about their damages during her deposition, and . . . they disclosed their financial documents in their first supplemental disclosures." *Id.* ¶ 9. We rejected this argument, explaining that previous cases made clear that "designating a fact witness and . . . providing supplemental records or diagrams [are] insufficient to designate that witness as an expert" when the witness is not actually included on the expert witness list. *Id.* ¶ 15. And while "we recognize[d] that all the disclosure rules require is that a party fairly inform its opponent that opinion testimony may be offered from a particular witness," we made clear that "the requirement to fairly inform includes that such witnesses be identified and the information about their anticipated testimony should include any opinion testimony that a party expects to elicit from them at trial." *Id.* ¶ 16 (cleaned up). Referring to implicit disclosure we stated that "there must be some disclosure of expected *opinion* and fact testimony" in addition to the party's expert designation. *Id.* (emphasis added) (cleaned up). We emphasized that Darnell's opinions were not disclosed and therefore held that the district court properly excluded her from testifying as an expert at trial. *See id.* ¶ 1. Because the same occurred here, exclusion was undeniably appropriate.

¶100   Circling back, in *Johansen*, this court expressly recognized,

> This result may seem harsh, but as this court recently stated, if litigants are tempted to play fast and loose with our discovery rules, then they run the risk of losing it all. And the fact that we sometimes uphold a district court's ruling in this regard should offer no solace or refuge to parties if they determine to ignore the rules. Our discovery rules are written to be followed, and if parties determine that they want to skirt around them, then let them be warned once more that they face a

> significant risk that an untimely, inadequate, or skipped disclosure will be found insufficient and the evidence or the witness may not be allowed.

2021 UT App 130, ¶ 32 n.10 (cleaned up). The *Johansen* court's warnings anticipated this case. Despite its acknowledgment that the disclosure in this case was deficient, the majority declines to follow through on these long-announced warnings.

## VI. The Future: Practical Implications of the Majority Opinion

*What's a District Court to Do?*

¶101   The majority's holding really seems to be based on the apparent drawbacks of the *policy* of presumed exclusion under rule 26(d)(4). Until now, however, the law was settled that district courts were under no obligation "to ameliorate or blunt the resultant prejudice which occurs when a party ignores disclosure requirements." *Hansen v. Kurry Jensen Props. LLC*, 2021 UT App 54, ¶ 48, 493 P.3d 1131 (Mortensen, J., concurring, joined by Pohlman, J.). The majority opinion tacitly overrules this language by placing the burden on the district courts to obviate the harm associated with deficient expert disclosures. Otherwise, those courts risk being reversed on appeal. *See supra* ¶ 53 (explaining that "any harm sustained . . . by UDOT and Staker could have been entirely ameliorated with simple measures well short of exclusion of Expert's testimony and dismissal of the Al-Imaris' case").

¶102   Reading presumed exclusion out of the rule will likely make *RJW Media*'s, *Hansen*'s, and *Johansen*'s warnings completely illusory. *See RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 30, 392 P.3d 956 (warning litigants about the danger of making "minimally compliant" disclosures—i.e., exclusion of witnesses and evidence); *Hansen*, 2021 UT App 54, ¶ 49 (Mortensen, J., concurring, joined by Pohlman, J.) (cautioning litigants against "play[ing] fast and loose with our discovery rules"); *Johansen v.*

*Johansen*, 2021 UT App 130, ¶ 32 n.10, 504 P.3d 152 (warning litigants "once more" of the pitfalls of "skirt[ing] around" discovery rules); *see also* Utah R. Civ. P. 26 advisory committee's note to 2011 amendment ("Not being able to use evidence that a party fails properly to disclose provides a powerful incentive to make complete disclosures. This is true *only if trial courts hold parties to this standard.*" (emphasis added)). Here, the majority declines to affirm the district court's decision to hold the parties to this standard.

¶103   Similarly, the majority's approach will undoubtedly cause confusion among district courts and practitioners alike. Indeed, the majority's analysis suggests that a district court, when it finds a disclosure inadequate, can be unreasonable when it excludes the inadequately disclosed evidence, even when that sanction is presumed under the applicable rule. The exception to exclusion will always swallow the rule. Witness disclosures that do not include any actual opinion whatsoever will not result in exclusion as long as a supplementation to the vague "summary" is offered before the trial court rules on exclusion. A defective damages disclosure—or worse yet, a failure to provide *any* calculation of damages—will easily pass muster so long as the required numbers and calculations are provided before the trial court rules on a motion to exclude the challenged damages. This, again, contravenes long-established precedent. *See, e.g.*, *Keystone Ins. Agency, LLC v. Inside Ins., LLC*, 2019 UT 20, ¶¶ 2, 8, 445 P.3d 434 (affirming district court's exclusion of damages based on plaintiff's failure to disclose and court's subsequent grant of summary judgment on all of plaintiff's legal claims); *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶¶ 1, 3–4, 370 P.3d 963 (affirming district court's grant of summary judgment when disclosing party failed to disclose $2 million damages computation until a year after discovery closed).

¶104   Stated simply, the majority's approach will invite ambush tactics and potentially incentivize recipient parties to defer

objecting until trial, lest the opposing party be given the opportunity to remedy a problem that party caused with its deficient disclosure. This approach endorses shifting the risk to recipient parties, an approach our precedent has soundly rejected. *See, e.g.*, *RJW Media*, 2017 UT App 34, ¶ 30 ("A disclosing party who endeavors, by stratagem or otherwise, to disclose as little as possible faces a significant risk that the disclosure will be found insufficient and the evidence or the witness may not be allowed."); *Hansen*, 2021 UT App 54, ¶ 48 (Mortensen, J., concurring, joined by Pohlman, J.) (rejecting notion that district courts must "attempt to ameliorate or blunt the resultant prejudice which occurs when a party ignores disclosure requirements").

¶105 In sum, I doubt the trial bench will look forward to returning to the days of ambush by both sides rather than the orderly disclosure of information that rule 26 attempted to achieve. As long as the standard allows for any defects in disclosure to be cured up to (and apparently beyond) the time of a ruling on exclusion, litigants will game the system and foist a much more onerous and indecorous burden on our trial judges. Lazy or gaming disclosing parties will now know that as long as they fix the issue before the hearing on the motion to strike, they'll likely still be able to use the witness. Ever conscious of this possibility, calculating recipients will wait until trial to spring their objections on the trial courts and disclosing parties. The majority may accuse me of exaggerating the potential implications of its opinion, but its approach provides no logical limiting principles.

¶106 Thus, for very practical reasons, I simply cannot sign on to an approach that is inconsistent with the clear purpose of protecting the orderly unfolding of trials that the plain language of rule 26 and our precedent applying it has so carefully nurtured.

### VII. Consequence: Summary Judgment Correctly Granted

*Because she timely disclosed no witnesses or documents, and because the district court imposed the rule 26(d)(4) sanction upon her, [the plaintiff] was not entitled to use any witnesses or documents at trial. A litigant in such a situation has no way to prove her case. And under such circumstances, the district court did not err by granting summary judgment in the defendants' favor.*

*Segota v. Young 180 Co.,*
2020 UT App 105, ¶ 24, 470 P.3d 479

¶107 Based on its holding that the district court erroneously excluded Expert's testimony, the majority does not address whether summary judgment was appropriate in light of the remaining evidence. As I've explained, however, the district court properly excluded that testimony when the Al-Imaris failed to demonstrate harmlessness or good cause for the deficient disclosure. I therefore address the Al-Imaris' fallback arguments, which can be boiled down to a single assertion: based on the particulars of this case, Expert's testimony was not necessary to stave off summary judgment. In this part, I briefly re-recite the relevant background, set forth the applicable legal standards, and explain why the district court properly granted summary judgment in this case.

### A.   Relevant Background

¶108 The Al-Imaris sued UDOT and Staker for negligence. The complaint alleged that Staker—and by extension, UDOT[23]—owed

___

23. The Al-Imaris' theory of liability against UDOT was based on respondeat superior. The complaint alleged that Staker was acting as "an agent, servant, contractor, and/or employee under [UDOT]" when it allegedly created the unsafe condition that caused the Al-Imaris' car accident.

various duties to the Al-Imaris, including "properly maintain[ing] the construction site on SR89 in a prudent and safe manner"; "exercis[ing] ordinary care in . . . the proper cleaning, securing, maintenance, and timely inspection of the construction site"; and "provid[ing] proper warning signs informing [the Al-Imaris] of any potential hazards on the construction site, including oil or other slick surfaces." The complaint alleged that UDOT and Staker breached each of these duties and that the Al-Imaris suffered damages as a result.

¶109 The Al-Imaris disclosed that Expert would testify about various topics that the majority assumes related to the standard of care and causation. *Supra* ¶ 30. The district court excluded Expert's testimony based on what the majority concedes was a deficient disclosure. *E.g.*, *supra* ¶ 28. UDOT and Staker then moved for summary judgment, arguing that the Al-Imaris could not establish a prima facie negligence claim without expert testimony. The court agreed and granted the motion from the bench. In a written order memorializing the ruling, the court explained,

> As to duty, the [c]ourt finds that this is the type of case which requires an expert opinion or opinions as to the proper standard of care as to the road conditions, actions of Staker and/or UDOT, including signage before, during or after the road project, the application of materials including paving, the treatment of asphalt and other materials, or the application of any of the foregoing given the weather conditions, including inclement weather at the time of the subject accident. The [c]ourt finds that the understanding of these duties is beyond the grasp of a typical jury and requires . . . specialized knowledge of an expert.

The court also concluded that, without Expert's testimony, the jury would be left to speculate on causation because there was "no evidence that UDOT or Staker created the dangerous condition" or that it was even "a dangerous condition that caused . . . [Jeddie] Al-Imari to lose control of his vehicle." For these reasons, the court concluded summary judgment in favor of UDOT and Staker was appropriate.

B.      Standard of Review

¶110   We have consistently explained that "summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Nassi v. Hatsis*, 2023 UT App 9, ¶ 20, 525 P.3d 117 (cleaned up). While "the moving party always bears the burden of establishing the lack of a genuine issue of material fact, . . . the burden of production of evidence may fall on the nonmoving party (if that party will bear the burden of production at trial)." *Salo v. Tyler*, 2018 UT 7, ¶ 2, 417 P.3d 581. In such cases, "the moving party may carry its burden of persuasion without putting on any evidence of its own—by showing that the nonmoving party has no evidence to support an essential element of a claim." *Id.*

¶111   "In order to prevail in an action for negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused (4) the plaintiff to suffer legally compensable damages." *Cope v. Utah Valley State College*, 2014 UT 53, ¶ 11, 342 P.3d 243. "Where the average person has little understanding of the duties owed by particular trades or professions, expert testimony must ordinarily be presented to establish the standard of care." *Ross v. Epic Eng'g, PC*, 2013 UT App 136, ¶ 14, 307 P.3d 576 (cleaned up). We have often required expert testimony "to establish the standard of care for medical doctors, architects, engineers, insurance brokers, and professional estate executors."

*Id.* (cleaned up). More recently, we have explained that "[o]nly an expert would be intimately familiar with the industry standards for temporary traffic control." *United Fire Group v. Staker & Parson Cos.*, 2014 UT App 170, ¶ 12, 332 P.3d 394. We have therefore required experts to establish the standard of care in that industry as well. *Id.* When a party fails to provide expert testimony in such cases, summary judgment is usually appropriate. *See Paget v. Department of Transp.*, 2014 UT App 62, ¶¶ 1–2, 322 P.3d 1180.

C.      Discussion

¶112 The Al-Imaris argue that summary judgment was inappropriate even without Expert's testimony for two reasons. First, they claim that the "well pled facts" of their complaint "plainly allege[d] that [UDOT and Staker] created the situation that caused" their damages. Second, they maintain that they cited *some* evidence to support their negligence claim in their opposition to the motion. Both arguments are fatally flawed.

¶113 The Al-Imaris' first argument is easily addressed. When opposing a motion for summary judgment, a party may not rely on "mere allegations or denials" from its pleading. *Evans v. Huber*, 2016 UT App 17, ¶ 10, 366 P.3d 862 (cleaned up). Instead, the party "must set forth specific facts showing that there is a genuine issue for trial" by pointing "to relevant materials, such as affidavits or discovery materials." *Id.* (cleaned up). The allegations in the complaint simply were not competent evidence for purposes of the court's summary judgment ruling.

¶114 The Al-Imaris' second argument fares little better than their first. They state generally that UDOT and Staker "knew or had reason to know that the conditions created by [Staker's] construction were unsafe for motorists." In fact, nothing in the cited materials suggests that UDOT or Staker knew or had reason to know about the allegedly unsafe condition *prior* to the accident. The closest the Al-Imaris have come to establishing this fact is a journal entry from an alleged Staker employee in which the

employee states, "When I got out of the canyon our mechanic called and told me there was an accident on our jobsite. I headed back up to check on everything." But, again, the journal entry says nothing about UDOT's or Staker's knowledge of the condition prior to the accident.

¶115   The Al-Imaris also argue that "uncontroverted testimony on the record [showed] that no signage or other warnings for motorists existed relating to the conditions present on the road where [the Al-Imaris] were injured." This represents a closer call. In their opposition to the motion for summary judgment, the Al-Imaris cited deposition testimony from a witness who stated that there were no "Slippery When Wet" or "Caution" signs around the area where Staker repaved the road. Moreover, the police report indicated that the crash had not occurred in a work zone, which lends further support to a conclusion that the Al-Imaris had no warning of a potentially unsafe condition created by Staker. In a vacuum, this evidence may have helped preclude summary judgment. *See United Fire Group*, 2014 UT App 170, ¶¶ 13–14 (explaining that a negligence claim in an ostensibly similar case didn't require expert testimony when it was based on the defendant's failure to place "signs or devices to warn or guide [the plaintiff] away from danger").

¶116   The problem, however, is twofold. First, as already noted, the Al-Imaris adduced no competent evidence that Staker created the condition that caused the crash. Second, while the police report suggests that "a very slick patch of oil" caused the crash, the Al-Imaris conceded that "[i]t started raining 10–15 minutes before the subject accident" and that the "rain was heavy and one could see the water running off the road." Without an expert to testify in this situation, the factfinder would have been left to speculate as to which factor—the rain or the oil—caused the crash, which necessitated summary judgment. *See, e.g., Scott v. HK Contractors*, 2008 UT App 370, ¶ 17, 196 P.3d 635 ("A finding of

causation cannot be predicated on mere speculation or conjecture." (cleaned up)).

¶117  The Al-Imaris' second argument is also based on a flawed understanding of the law on summary judgment in Utah. As noted above, "where the burden of production falls on the nonmoving party, . . . the moving party may carry its burden of persuasion without putting on any evidence of its own—by showing that the nonmoving party has *no evidence* to support an essential element of a claim." *Salo*, 2018 UT 7, ¶ 2 (emphasis added). The Al-Imaris read far too much into the "no evidence" language from *Salo*. There, the court expressly adopted the summary judgment standard articulated by the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). *Salo*, 2018 UT 7, ¶ 2.

¶118  In the *Celotex* and *Salo* context, the party moving for summary judgment must show that the nonmoving party lacks the evidence to make out a *prima facie case*. *See Celotex*, 477 U.S. at 322 ("In our view, the plain language of Rule 56(c) [of the Federal Rules of Civil Procedure] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing *sufficient* to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (emphasis added)). Without expert testimony, the Al-Imaris lacked the necessary evidence to establish the duty[24] and causation elements.

---

24. The Al-Imaris appear to assume that the existence of a "clear" or "specific[]" duty obviates the need for expert testimony to establish the standard of care in a negligence case. The Al-Imaris point to no authority to support this assumption. Nor could they. In the medical field, for example, expert testimony is necessary "to establish the standard of care and proximate cause—except in unusual circumstances." *Newman v. Sonnenberg*, 2003 UT App 401,

(continued…)

*See Kent v. Pioneer Valley Hosp.*, 930 P.2d 904, 906 (Utah Ct. App. 1997) ("A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the elements of the prima facie case justifies a grant of summary judgment to the defendant." (cleaned up)). Therefore, the district court correctly granted summary judgment in favor of UDOT and Staker in this case.

## CONCLUSION

¶119 The majority correctly holds that the Al-Imaris' expert disclosure was deficient. Because the Al-Imaris do not meaningfully attack the district court's finding that the deficiency was harmful, that should be the end of the matter. The majority's holding to the contrary is at odds with the plain language of rule 26(d)(4) and the cases applying it. The majority's holding in this case may lead to confusion in the district courts and will likely disincentivize parties from being liberally forthcoming when making their expert disclosures, the very thing the amendment to rule 26 was supposed to curb. In short, I would have affirmed the trial court's exclusion of Expert's testimony and its grant of summary judgment. For these reasons, I respectfully dissent.

───────

¶ 19, 81 P.3d 808 (Orme, J., dissenting). That said, doctors frequently have "clear" or "specific" duties. One is the "specific duty not to abandon" a patient once "treatment and services have begun." *Id.* ¶¶ 9–13 (majority opinion) (cleaned up). Despite the specific nature of the duty, a plaintiff must establish it with expert testimony. The Al-Imaris' assumption is therefore incorrect as a matter of law.